MITCHELL v. CONNELLSVILLE CENTRAL COKE CO.

(Circuit Court of Appeals, Third Circuit. February 14, 1916. Rehearing Denied March 17, 1916.)

No. 2059.

1. PATENTS ⬯328—INVENTION—COKE OVEN.
    The Mitchell patent, No. 899,886, for a coke oven of rectangular shape with open ends, substantially parallel sides, and the end walls inclined or curved upward to form a peaked roof, is for an aggregation of structural features taken from pre-existing ovens, attaining no better or different results, and not involving patentable invention.

2. WORDS AND PHRASES—"COKE."
    "Coke" is partially consumed bituminous coal, from which the volatile constituents have been burned away. It may be described as a partly graphitized carbon, whose fiber has been affected by escaping and burning gases, so that it is lighter than coal, although its substance is hard and dense.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Thomas J. Mitchell against the Connellsville Central Coke Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of Orr, District Judge, on final hearing:

The bill in this patent suit was filed on April 21, 1910. The evidence was taken under the former equity rules. By the bill plaintiff avers title as inventor to United States patent No. 899,886, issued to him on September 29, 1908, for a coke oven, charges the defendant with the infringement of the rights of the plaintiff, in that the defendant has erected and is using coke ovens covered by the letters patent, and prays for the usual relief. The answer denies the validity of the patent upon the grounds of prior publication and prior use, and upon other grounds, some of which will hereafter appear.

In the manufacture of coke a great variety of ovens has been used since the industry began. Such variety was occasioned, not only by variance in the opinions of scientific men and by variance in the experiences of practical coke burners, but by the diversity of purposes for which coke is used and by reason of the differences in qualities of the different coals available for the manufacture of coke. Such various ovens are well classified as being with few exceptions either beehive ovens or longitudinal ovens. The name of the former is more descriptive than the name of the latter. The old fashioned dome-shaped beehive apparently suggested the form of the ovens of the first class. They are used in great number throughout those portions of the United States where coke is manufactured. They are made of brick and the circular floor is surrounded by a circular brick wall, perpendicular for a greater or less distance from the floor and surmounted by a dome, in the center of which is what is called the trunnel hole, whereby the oven may be charged with coal, and whereby the gases may escape during the coking process. In the beehive oven there is but one door, which is closed during the coking process, except for small, thin openings, which admit air so as not to prevent sufficient combustion, and from which the coke is removed after the process has been completed. Because of the relation between the size of the door and the floor of the oven the hard mass of coke was required to be broken, and in addition was slowly and with difficulty removed.

The problem had long been presented to coke manufacturers as to how the coke could be removed from the coke oven without its fracture into unneces-

sary small pieces, and without the delay and expense which were incident to the removal of the coke from the beehive oven. It became apparent that the coke could be more easily removed from an oven by the use of machinery which would push the body out from the floor of the oven, or pull it out by mechanical means, rather than by means of workmen using hand tools. It became apparent, also, that if there were opposite doors a pusher or drag could be better introduced at the one door and force the coke out of the other, and it became apparent that such pusher or drag would not reach into the arches which would exist in the circular beehive oven between the opposite doors in such oven, if opposite doors were introduced therein.

This problem had presented itself to Richard Thomas, of Carbondale, Ill., in the year 1881. It presented itself to the plaintiff in this case in the year 1905, when he first began his experiments. Richard Thomas procured from the United States two patents, each for a coke furnace and apparatus connected therewith, numbered and dated, respectively 249,694, November 15, 1881, and 276,504, April 24, 1883. In neither of the said patents, however, is there a description of the coke furnace, except as it may be drawn from the drawings attached thereto, in which is shown a longitudinal furnace, with doors at either end; but each patent elaborately describes and claims apparatus for the withdrawing of coke from the furnace. There was subsequently built at Coalburg, in Alabama, 64 of the Thomas ovens arranged in "one single continuous battery." The construction of coke ovens in what has been thus termed a "battery" is an old arrangement, due to the fact that the ovens may be filled with coal more readily, for across the top of the ovens extends the track upon which the larrie, or hopper, or measure, from which the coal is discharged into the ovens, is moved. It is convenient, also, because the masonry of one oven tends to support the masonry of an adjoining oven. This feature of construction was common, and is to-day common, in the erection of beehive ovens.

These Thomas ovens at Coalburg were equipped with apparatus for withdrawing the coke, and were used with such apparatus for many years. Other Thomas ovens were built at other places as well, but the ovens at Coalburg are the Thomas ovens which are the subject of special consideration in the record of this case. That the plaintiff had seen these Thomas ovens prior to the construction by him of any of the ovens with which he was experimenting appears from his testimony, not only as given in the case at bar, but as given in the interference proceedings in the Patent Office, in which certain claims made by him were involved. It is doubtful, however, that the plaintiff in the case had ever studied the published and printed descriptions of the Thomas oven. Prior to 1895 Richard Thomas published and widely distributed a printed circular describing "the Thomas coke oven and direct loading apparatus." The circular opens with a description of which the following is a material portion, one sentence of which we have italicized:

"This oven is one of the class in which the coking of the coal is done by the internal heat of the oven. This is the old beehive principle, the gas being consumed above the charge. *The Thomas oven is an elongation of the beehive, the change in shape being made to facilitate the withdrawal of the charges by machinery.* The ovens are built side by side to any desired number, and are 9 feet 6 inches wide from center to center, 7 feet 9 inches wide in the clear in the front end, and 7 feet 3 inches at the back end in the clear, and 8 feet high from the platform. They are 5 feet high under the main arch and 36 feet long for coal yielding less than 60 per cent. coke, and 32 feet long when the yield is over 60 per cent. This difference in the length is to keep the weight of the charge within the limit of 7 or 8 tons, as it is found more economical to limit the draw to that amount. The bottoms are made in the usual way for beehives, the only difference being in the shape of the foundation. In the beehives it is circular while in the Thomas it is lengthwise of the oven. The side walls are 21 inches thick at the front end and 27 inches at the back end, and are 2 feet 6 inches high from floor to skew back. The front arches have a rise of 18 inches, and are 2 feet 6 inches long. A space of 3 inches is left between the main and front arches. This is to prevent the expansion of the main arch from disturbing the front walls. The main arch has a rise of 2 feet 6 inches and is turned with one course of

brick 9 inches deep, which usually are made 4 inches and 4½ inches x 9 inches x 12 inches. There is a rise in the oven of 9 inches towards the chimney from the front end. The ovens are built some with three charging holes and a chimney at the back and some with two charging holes and a chimney. Where coal is brought direct from the mines to the ovens to be coked it would be advisable to have three charging places. Where the coal is brought in larries two charging places will do. If the oven is only 32 feet long with two tracks and charging holes, with the chimney in the middle, the bottom of the oven is on a level. *The main arch has a rise of 6 inches from both ends towards the chimney or the center of the oven.* All other particulars are the same in both ovens except the length of the oven and the position of the chimney."

While the ovens erected at Coalburg and owned by the Sloss Iron & Steel Company were the subject of attention, as appears by the publication of the Proceedings of the Alabama Industrial and Scientific Society, vol. 1, 1891, and by a publication by John Fulton of a treatise on the Manufacture of Coke, published at Scranton in 1895, yet interest in them was chiefly because of the apparatus for the withdrawal of the coke from the ovens. Likewise in 1905 and 1906, when the plaintiff was experimenting at Mt. Braddock in the state of Pennsylvania, and had built his first oven without any rise, and afterwards a second with such rise "from both ends towards the chimney or the center of the oven," great interest was shown by newspaper representatives in what the plaintiff was doing, with the result that there were a number of news accounts in Pittsburgh, Connellsville, and perhaps other papers, giving more or less exact descriptions of improvements which the plaintiff was supposed to have invented. These publications showed their chief interest in the features of economy and ingenuity displayed in the method of withdrawing the coke from the ovens. The plaintiff, so far as it appears, made no claim to invention for the apparatus for the removal of coke from the ovens, but on November 27, 1906, filed an application for a patent which resulted in the grant of the patent in suit.

Before taking up the patent for particular consideration, it is well to notice that nowhere in the patent is a single measurement or dimension stated. In the specifications the patentee states the object of his patent as follows: "This invention relates to coke ovens, and has for its principal object to provide an oven of simple construction which may be built, maintained in working order, and operated at a much smaller cost than an ordinary beehive and other types of ovens now in use. A further object of the invention is to provide an oven open at both ends for the insertion of a coke pusher at one end, and the discharge of the coke at the opposite end, the top or crown of the oven being inclined or curved upward from a point near each end to a point about the middle of the length of the oven wall, and at this point is a top opening through which the oven may be charged. A still further object of the invention is to provide an oven of this type in which the top or crown is inclined or curved upward from points near the opposite ends toward the center to form a combustion chamber for the more perfect combustion of the gases distilled from the coking coal and by which combustion the crown or roof of the oven becomes intensely heated, thereby increasing the efficiency of the oven by reflecting the heat downward on the coking coal, and result in a superior quality of coke, and will, furthermore, permit the consumption of the gases without material waste of the carbon of the coal."

The description in the specifications is as follows: "The floor *10* of the oven is flat and slightly inclined toward one end and extends between two walls *11* formed of brick or stone, the oven opening at both ends, so that a pusher may be inserted at one end and forced through the oven to discharge the coke. The side walls *15* are vertical and are substantially parallel with each other throughout their entire length, while the crown *16* is arched from side wall to side wall. From each end of the oven the arch extends inward for about the thickness of the retaining walls, and thence slopes or curves upward at each end toward a point about midway of the length of the oven, and at this point is an opening *17* through which the coal may be inserted to form the charge."

Passing by the patentee's description of the advantages of his oven, the

language of the last paragraph of the specifications, a portion of which we have italicized, should be noticed: "It will, of course, be understood that the shape of the roof of the oven may be altered in many ways without departing from the invention, and it may be sloped on straight lines, as indicated in Fig. 1, or on curved and straight lines, shown in Fig. 4, or the roof may be curved throughout, or otherwise so shaped *that the vertical distance between the floor and the roof gradually increases from the doors inward.*" It is apparent that the roof of the Thomas oven, as described in the circular, is of a form which the patentee in the patent in suit recognizes as a form within the description of his patent.

And here it is proper to call attention to what appears to be an error in the plaintiff's brief. It is there stated that "this Thomas oven figures in the history of the Mitchell invention, and its bearing on the issues herein is made clear, not only by the application record of the Mitchell patent, which is printed in defendant's record, volume 2, page 551, but also by the Mitchell interference testimony, also printed in defendant's record, volume 2, commencing on page 343." It does not appear that the Thomas oven, as described in the circular published by him, was the subject of consideration in any way in the history of the Mitchell patent. The evidence of Mitchell in the interference proceedings was to the effect that he had seen the ovens at Coalburg, and those ovens were constructed without a rise in the main arch from both ends toward the chimney or the center of the oven. The reference in the application record of the patent is to a French patent issued to, a Mr. Thomas of Paris in 1855. There is no evidence in the case that the Richard Thomas of Carbondale, Ill., in 1881, is the same person as the Mr. Thomas, of Paris, in 1855.

The claims of the patent in suit are as follows:

"1. A coke oven having a substantially level floor and parallel side walls higher in the middle than at the ends, said oven being open at both ends from wall to wall to provide an unobstructed, free passage from end to end, and a crown sloping upward from the ends toward a point about midway of the length of the oven and there provided with a charging opening.

"2. A coke oven having a substantially level floor, end retaining walls each with an opening of the same size as the opening in the other wall, a crown sloping continuously upward from the end retaining walls to an approximately central point and there provided with a charging opening, said crown being arched in a direction at right angles to the length of the oven, and parallel side walls extending through and from one opening to and through the other opening and approximately to the top of the crown adjacent to the charging opening therein.

"3. A coke oven having a central trunnel hole in its roof, the length of the oven chamber and the height of the roof being so proportioned that when the top of a charge of coal deposited by gravity through the trunnel hole reaches said trunnel hole, the charge when levelled off will fill the oven substantially to the level of the draft openings.

"4. A coke oven having a substantially level floor and provided with parallel side walls, higher at the middle than at the ends, said oven being open at both ends from wall to wall to provide an unobstructed, free passage from end to end, and a crown rising from the ends and provided about midway of its length with a trunnel hole."

The first, second, and fourth claims are met by the Richard Thomas circular in every respect, except as to the charging opening midway in the roof of the oven. There were two charging openings and also a chimney for the escape of gases in the Thomas ovens as erected at Coalburg and other places. But according to the testimony of the plaintiff, who saw such ovens, the charging openings were closed during the process of making coke, leaving therefore only the chimney for the escape of the gases. The location of the trunnel hole, which is a chimney as well as a charging hole, in the center of the oven at the highest point of the arch of the roof, was in no way invention, because it was so located in the beehive oven, with which all persons connected with the industry were familiar.

The floor of the Thomas oven was substantially level. It had parallel side walls, which were higher in the middle than at the ends, or the equivalent thereof, to wit, a higher arch in the middle than at the end. The oven was

open at both ends from wall to wall to provide an unobstructed free passage from end to end, and, as clearly shown in the circular, a crown, sloping upwards from the ends towards a point about midway of the length of the oven. Indeed, every element of those three claims was found in the prior art, but not always together.

The third claim of the patent, as appears by the file wrapper, was introduced at the suggestion of the examiner of patents. It claims a construction in which there shall be an uncertain proportion between the length of the oven chamber and the height of the roof. The proportion required by the claim is that, when the top of a charge of coal reaches the trunnel hole, the charge when leveled off will fill the oven substantially to the level of the draft openings. It will be noticed that in this claim 3 there is a claim to an invention without regard to the shape of the roof.

The evidence discloses that there is an established practice in the industry which has apparently arisen to leave Sunday a day free of work in emptying and filling ovens. Each coke oven has at times charges of coal in such amounts as will produce coke in 48 hours, and again has such charges of coal as will produce coke in 72 hours. The 72-hour charge burns during Sunday. The charge, therefore, is different for the time intended to be taken in its reduction to coke. The plaintiff on cross-examination was asked: "If it should happen that a 72-hour charge dumped in without spreading should reach the trunnel, it would necessarily be true, would it not, that a 48-hour charge dumped in without spreading would not reach the trunnel, and further, if a 48-hour charge dumped in without spreading should reach the trunnel, a 72-hour charge would more than fill the oven, or rather the oven would not accommodate it unless spreading were begun before dumping in were completed." His answer is significant: "That is true, and I will further add that I do not think an oven could be built to measure every charge it was intended to receive, as they must necessarily vary."

As already appears, the description of the oven of the patent is meager; but the oven which the plaintiff built in 1906, after his first experiment with an oven which was in form like the Coalburg ovens, was 8½ feet high. It was in pursuance of operations with that oven that application was made for a patent. It was not until later that he built nine additional ovens at the height of 7½ feet in the center. Without going into the details of the proportions of the plaintiff's ovens and those of the defendant's ovens, it appears that, without regard to such proportions, the defendant's oven is lower than the oven of the patent. The consideration of proportions, in passing upon a claim such as claim 3, is of considerable difficulty. The weight of the testimony, however, indicates that the proportion contemplated in the third claim of the patent in suit is met in the prior art. It appears to be unnecessary to refer in detail to such testimony because the subject of proportion, as suggested by the third claim, and even the claim itself, is not given attention in the plaintiff's brief. It is apparent that the patent is so uncertain in its disclosures that the structure of the patent could not be arrived at, except as the result of experiment.

It is urged by the defendant that, if anything, the disclosures and claims of the patent are a mere aggregation of elements found in the prior art, which produce no new result, and the weight of the testimony sustains this contention. The plaintiff replies, however, that, if that be true, why does the defendant continue to use the coke ovens complained of. Plaintiff cites authorities to the proposition that the courts have looked with disfavor upon such a defense where the defendant has made an appropriation and use of the invention covered by the patent sued upon. The facts in this case, however, take the defendant without the rule of such cases. The plant of the defendant, which consists wholly of these ovens complained of, was projected in 1906, and the first 100 ovens were built and put in operation in 1907. The additional 110 ovens, which according to the testimony were projected from the first, were built and put in operation in 1909. The relations between the plaintiff and the parties controlling the defendant company were cordial. Mitchell states in his testimony that at the time of his experiment mechanical operation was the main object. Mitchell and the representatives of the defendant had interviews with respect to the experiments that Mitchell was un-

dertaking, and the first and second ovens which Mitchell built were open to the inspection of all who chose to visit them. His first oven, built in the fall of 1905 and the following winter; had a horizontal crown straight through from end to end. His next oven, built some time in 1906, had the rising crown, and in March of 1907 he had built eleven ovens of which ten had the rising crown and one the straight crown. Mitchell knew that the defendants were about to build a battery of ovens at their new plant. He had knowledge of what the defendant's representatives were doing. He himself admits that he was informed that the defendant was going to "draw" an oven of the type complained of in the spring of 1907.

But it is an inference justified by the spirit of competition existing between manufacturers of a standard product, which implies the acquisition of information as to what competitors are doing, and by the friendly relations between the parties above referred to, that the plaintiff knew what was going on at the new plant of the defendant; yet the plaintiff was silent in all interviews with them and in every other way as to his claim to invention, and made no protest against the action of the defendant until November 12, 1908, when he gave notice charging them with infringing his patent. At that time the first 100 ovens of the defendant had been in operation for over a year. It is no excuse for Mitchell that he withheld all assertion of his claim to invention because of interference proceedings in the Patent Office with one who was associated with him in the common employment at Mt. Braddock. It is true he could not maintain an action against the defendant until after his right was established by the Patent Office; but his failure to assert his right, in order to prevent the expenditure by the defendants of large sums in the construction of ovens in which he hoped to have a monopoly, tends to establish the good faith of the defendant and to impair the equity of the plaintiff in the present proceeding.

In view of the silence of the plaintiff, it is not to be presumed that the defendants were affected by notice of the contemporary newspaper notices of the plaintiff's tests, especially as they emphasized the novelty of the mechanical means by which the coke was intended to be withdrawn from the ovens. Further, it should be noticed that the plaintiff, after giving such notice of November 12, 1908, delayed bringing suit for perhaps a year and a half afterwards, and delayed beginning the proofs until nearly a year after the suit was brought. The whole conduct of the plaintiff indicates that he did not for a long time believe that he had a patent of any great value.

There is nothing in this case which warrants a decree in favor of the plaintiff. The patent is invalid because of the disclosure of the Richard Thomas publication, if not by reason of other prior uses. It is invalid because it is a mere aggregation of old elements, which, so far as the record shows, does not produce a new and better result. The disclosures of the patent are insufficient to enable one skilled in the art to make the apparatus of the patent without experiment.

The bill must be dismissed, at the cost of the plaintiff. Let a decree be drawn.

Thomas J. Mitchell, Melville Church, and David P. Wolhaupter, both of Washington, D. C. (E. C. Higbee, of Sterling, Higbee & Matthews, of Uniontown, Pa., and Charles M. Clarke, of Pittsburgh, Pa., of counsel), for appellant.

Bayard H. Christy and Christy & Christy, all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This case turns upon the validity of patent No. 899,886 granted September 29, 1908, to the plaintiff, Thomas J. Mitchell, for "a new and useful coke oven." The record

discloses no controversy about infringement, but for several reasons that appear in the opinion below the District Court held the patent invalid. A proper understanding of the issue will be promoted by a few preliminary remarks concerning the manufacture of coke, and also concerning the state of the art at the time Mitchell entered the field.

[2] Coke is partially consumed bituminous coal, from which the volatile constituents have been burnt away. The combustion takes place in ovens. or closed retorts, free contact with the atmosphere being thus prevented, while sufficient air is easily supplied. Essentially, coke consists of carbon and a residuum of such noncombustible materials as may be present in the coal. If it is made rapidly and at comparatively low heat—for example, the coke produced in making illuminating gas—it is black in color, spongy in fiber, and burns readily; if the heat has been high and more protracted, as in the case of coke intended for smelting, the color is gray, with a semimetallic lustre, the fiber is hard and dense, and it can only be burnt with the aid of a strong draft or blast. Coke may also be described as a partly graphitized carbon, whose fiber has been affected by the escaping and burning gases, so that the coke is lighter than the coal, although its substance is hard and dense. The patent applies in terms to coke ovens generally, but evidently is directed specially to an oven adapted to produce coke for smelting in a foundry or a furnace; and (unless otherwise stated) what we have to say must be understood as relating only to such a structure.

Nearly all of it being fixed carbon, coke is a well-known fuel. Owing to its hardness and density and cellular structure, it has considerable strength, and will bear a heavy load of ore and limestone in a furnace, forming at the same time a layer that affords many passageways for heat and the air of the blast. It has similar advantages in the foundry smelting of pig iron. Under like conditions bituminous coal would be so compressed as to burn with much difficulty. When the coal is sufficiently heated in the oven, the volatile matters are given off as gas, and in the end what is left of the coal is fused into a mass, and its structure is changed. Its silvery appearance is due to the fact that some of the carbon in the gas is deposited on its outer surface. The necessary heat is obtained by burning the gases that are given off during the operation, and in an oven of the open type—that is, with one or more openings in the roof—these gases are immediately burnt in contact with the coal. Such an oven is a nearly closed structure of brick or stone, banked on the outside with clay to keep the heat in, and lined throughout with refractory brick. The coal to be coked is spread in a layer on the bottom, and the rest of the inclosure is built in such a form as to leave a space or chamber above the coal where combustion may proceed. There are several varieties or types; perhaps the oldest and the oven still most widely used being the beehive, whose shape is suggested by its name. A more recent type is rectangular, long, and comparatively narrow, and to this class the Mitchell oven belongs. There are other types and shapes also, to which we shall refer hereafter.

A word may be said about the by-product oven. This is a closed

retort in which a forced draft is used, and the heat is applied indirect-. ly through flues in the walls. This oven also produces furnace coke, but only a part of the gases is burnt, the rest being led away and converted into other useful products.

An important step in the process of coking it to make the walls and roof of the oven hot enough to ignite the coal without the aid of flame or combustible material; after the initial heating and the initial charge, the walls should become very hot and should retain so much of their heat after the charge has been withdrawn that the oven can be recharged almost at once, and ignition will automatically and speedily take place, thus carrying on the process continuously. During the operation the gases are driven off into the combustion chamber above the coal and are there ignited, so that burning begins at the top and extends downward to the bottom of the layer. After the volatile matters have been burnt, the coke lies on the floor of the oven in a coherent and glowing mass, and may be cooled either in place or outside. If the water is applied inside, care is taken to introduce no more than enough, in order to keep the lining as hot as possible. The coke is then ready to be withdrawn, but as it has now become a coherent mass it was for many years necessary to break it up before it could be taken out. This is still necessary in the beehive oven, where the breaking is done by hand, and the coke is pulled out in comparatively small pieces. For several reasons this process is wasteful. It is slow, and therefore costly in time and labor, and it also wastes material, because too large a percentage of the coke is broken into sizes that are not satisfactory for use in a furnace or a foundry. The refuse (which usually goes to the waste pile) is often called "braize" or "breeze"; it includes, not only the small pieces of coke just referred to, but also the ash produced during combustion.

From an early period, therefore, the art had to deal with several important problems, such as the best shape of oven, the best way of applying the heat, the best way of utilizing the products of combustion, and the best way of removing the coke. And this brings us to consider the stage that had been reached when the Mitchell oven was devised. Fulton's treatise on Coke, published in Scranton in 1895, is a mine of information on this subject, and for many of the facts stated in this opinion we are indebted to this useful volume. Just when the beehive oven began to supersede coking in the open air—the "mound" method, resembling the method of making charcoal—we do not accurately know, but it was certainly many years ago. At first these ovens were open-top and rectangular, the top sloping up from each side in the shape of a truncated pyramid to the trunnel or opening, but afterwards the shape was changed to the present form—the round top now rising as an inverted hollow hemisphere, thus affording a very satisfactory combustion chamber. There is no doubt at all that the beehive makes excellent coke, but of course all the products of combustion escape into the air through the trunnel hole, and, as there is only one opening in the side (and that a comparatively small opening), the coke must be broken up before it can be withdrawn. In other respects the beehive

does its work admirably, and has thus far held a largely predominant place in the art.

The Welsh oven is also an old type, and is thus described by Fulton, page 121:

"The main effort in reducing cost was directed to a new plan of coke oven, retaining the principles of the beehive, but planning the new oven, so as to draw the coke by mechanical appliances.

"The Welsh oven consisted of an arched chamber 12 feet long, 7 feet broad, and about 6 feet high.

"One end of this oven is walled up; the other end or front has doors or luted walls. A flue chimney at the closed end of the oven affords egress to the gases.

"The coke is drawn out by a 'drag.' This drag is composed of a main iron bar running the length of the oven and having a crosspiece at the inner end. The whole drag is placed in bottom of oven before the charge of coal is placed in it.

"It remains under this charge of coal until it is coked and ready for drawing out, when a chain is attached to an eye in the drag at front of oven, pulling out the coke, in mass, by windlass or engine power.

"The coke is usually quenched or cooled outside the oven.

"With skill this method of coke manufacture possesses some advantages in the economy of the work in drawing the coke out of oven, without injuriously affecting the physical condition of the coke.

"The cooling outside the oven, by watering, is the chief objectionable feature in this section of the work of coking, as coke watered in this way, if done in a clumsy manner, would contain from 8 to 15 per cent. of water, neutralizing the advantage secured in the rapid drawing of the coke by mechanical means."

These British ovens were used to some extent in the United States.

The Belgian oven (also many years old), which leads the products of combustion under the hearth through flues, is long and rectangular, and is thus described by Fulton (page 139):

"The Belgian coke oven was evidently designed to satisfy three principal requirements:

"First. To meet the condition of coking coals of inferior quality, requiring the economy of heat from the gases by returning them under and around the coking chamber of the oven, through passages and flues, and to retain the oven heat by the rapid discharge of the coke, cooling it outside the oven.

"Second. In the economy of the work of drawing or discharging the coke from the oven by mechanical appliances, in place of the rather slow and expensive methods of performing this work by manual labor.

"Third. Excluding the air in coking the coal as much as practical, so as to save the waste of fixed carbon usually made in ovens admitting the admixture of air in the coking chamber, and in affording an increased percentage of coke from the coal charged in oven.

"The inferior dry coals of continental Europe could only be coked to best advantage in closed ovens.

"It involves, however, the necessity of cooling the coke outside the oven, leaving in this coke 4 to 8 per cent. of moisture, under ordinary conditions.

"Whether the increased product of coke, from the coal charged in these ovens, will compensate for the augmented moisture in the coke, from the necessity of watering it outside the oven, will be considered hereafter in detail.

"On the other side, by this rapid discharge of coke, the oven heat is retained and acts quickly on the newly charged coal, utilizing the small volume of fusing matters in the dry coals. * * *

"Its general design consisted in the economy of heat, in coking the inferior dry coals.

"The width and height of this oven chamber were usually proportioned to meet the requirements of the coals to be coked. The dryer the quality of the coal, the narrower the chamber of the oven. And conversely, the oven was

made wider when the coals inheriting more hydrogenous matters were to be used in coke making."

These Belgian ovens also were used to a limited extent in the United States.

Other ovens may be briefly noticed. In certain respects the French patent of 1855 to Thomas (not the Thomas hereafter referred to) deserves consideration. This oven may be used singly, although ordinarily it would be employed in a group or battery varying in number; if used singly, it would be rectangular, with an arched crown or roof, a door at each end, one door being narrower than the other, the roof sloping upward from the front to the rear and having two charging openings. The Perate French patent of 1854 is also a longitudinal oven with a mechanical pusher to discharge the coke, and only one charging opening in the roof. The American patent to Knab of 1858 is a by-product or retort oven; it is longitudinal, has an arched roof, which slopes upward a short distance from each end (although for the most part the roof is horizontal), and the coke is pushed out mechanically. The Aitken German patent of 1883 is also a retort oven; it is longitudinal, has an arched roof sloping upward at the ends, although the slope is not continuous to the center, and is discharged by mechanical means. The Rive de Gier oven antedates 1850. It is oval in ground plan with doors at each end, the roof is arched lengthwise as well as transversely, and it has one trunnel hole in the center of the roof. The coke is not discharged mechanically. The Wedding device goes back to 1890, and shows an elongated hexagonal oven having doors at each end and three openings in the roof (of which, however, one or two may be closed); and the roof slopes upward from each end for about one-fourth of its total length, while the central half of the roof is horizontal. There are no mechanical means for discharging the coke.

We now come to an item of evidence on which the defendant lays much stress, the Thomas leaflet or advertising circular, whose date of issue precedes January, 1891. It is signed by "Richard Thomas, Patentee, Birmingham, Ala.," and describes the Thomas coke oven and direct loading apparatus. Its publication is satisfactorily proved, and indeed is scarcely contested. The patents were granted in 1881 and 1883, and the oven described in the circular is longitudinal and rectangular, having three openings for charging and the escape of combustion products, with an arched or vaulted roof, and an opening at each end as wide as the oven. The coal is charged from larries or wagons in the usual manner, and is then raked level, the charging openings are closed, and coking goes on. This being finished, the coke may be "quenched" in the oven or outside. Then follows its mechanical removal by a scraper previously set, which draws the coke out in a mass. Further quenching may then be done, if necessary, after which a conveying device carries the coke directly to the railroad car. The circular is illustrated, and the following quotation (which has some omissions not now important) applies to Fig. 4:

"The ovens are built side by side to any desired number, and are * * * 7 feet 9 inches wide in the clear in the front end, and 7 feet 3 inches at the

back end in the clear. \* \* \* They are 5 feet high under the main arch and 36 feet long for coal yielding less than 60 per cent. coke, and 32 feet long when the yield is over 60 per cent. \* \* \* The bottoms are made in the usual way for beehives, the only difference being in the shape of the foundation. In the beehives it is circular, while in the Thomas it is lengthwise of the oven. The side walls \* \* \* are 2 feet 6 inches high from floor to skew back [i. e., the spring of the arch of the vault]. The front arches have a rise of 18 inches, and are 2 feet 6 inches long. A space of three inches is left between the main and front arches. This is to prevent the expansion of the main arch from disturbing the front walls. The main arch has a rise of 2 feet 6 inches and is turned with one course of brick 9 inches deep. \* \* \* The ovens are built some with three charging holes and a chimney at the back, and some with two charging holes and a chimney. \* \* \* If the oven is only 32 feet long with two tracks and charging holes, with the chimney in the middle, the bottom of the oven is on a level. The main arch has a rise of 6 inches from both ends towards the chimney or the center of the oven."

In brief, Fig. 4 shows a rectangular oven, 32 feet long, $7\frac{1}{2}$ feet wide, the front being 6 inches wider than the rear to make discharging easier. The side walls are vertical, but the vault is arched. The doorways are 4 feet high and $2\frac{1}{2}$ feet deep. Just inside, the vault steps up one foot and then slopes upward to the center from either end, rising 6 inches in $13\frac{1}{4}$ feet, thus increasing considerably the capacity of the combustion chamber. The arched roof has 3 holes, a chimney in the middle, and on either side a charging hole, which is to be covered while coking is going on. The rise in the roof from the end to the center is about 2 per cent., while the Mitchell oven (we may note in passing) has a rise of about 20 per cent. and the defendant's oven a rise of about 14 per cent. The Mitchell patent gives no specific direction on this subject, merely stating that the crown should slope "continuously upward."

Another important structure in evidence is the Coalburg ovens, the property of the Sloss-Sheffield Steel & Iron Company, near Birmingham, Ala. There were 64 of these ovens, built after the Thomas design, except that the crown of the roof was horizontal. Each oven was a rectangular tunnel having parallel sides, an arched or vaulted roof, and end doors as wide as the oven. Each had a short chimney, and two charging holes. There was also apparatus for mechanically discharging, and for loading the coke into cars. Each oven was 37 feet long, 7 feet wide, and a little more than 4 feet high to the crown of the vault. The charging holes were about 12 feet from the respective ends, and the chimney was at the rear. Originally there were ports or flues for the admission of air through the walls, but these were soon abandoned (as Mitchell also abandoned them when he experimented with the Thomas oven in 1906–07). The charge of coal was measured in the larries, and dumped through the charging holes into the chamber, where it was leveled by hand to a uniform bed or layer of proper depth. The operation then proceeded in the usual fashion for 48 or 72 hours, depending on the size of the charge, after which the mass was pulled out as a whole by a drag or scraper, and passed under a sprinkler, where it was cooled before loading in the cars. These ovens were built before 1890, and continued in regular service from that time for more than 20 years; the coke being used in the Steel & Iron Company's blast furnaces.

It will thus be seen that the prior art contains several examples of long, narrow, rectangular ovens, having open ends, rising vaults, or roofs, one or more charging openings, either central or at other points in the roof, and devices for discharging the coke mechanically. Only a limited field seems left for an inventor, and in point of fact Mitchell does not claim to have added anything to the art except a peaked roof. He has other patents covering mechanical appliances in aid of the process, but these are not in issue. Let us see what the patent before us describes and claims. The specification states:

"This invention relates to coke ovens, and has for its principal object to provide an oven of simple construction which may be built, maintained in working order, and operated at a much smaller cost than an ordinary beehive and other types of ovens now in use.

"A further object of the invention is to provide an oven open at both ends for the insertion of a coke pusher at one end, and the discharge of the coke at the opposite end, the top or crown of the oven being inclined or curved upward from a point near each end to a point about the middle of the length of the oven wall, and at this point is a top opening through which the oven may be charged.

"A still further object of the invention is to provide an oven of this type in which the top or crown is inclined or curved upward from points near the opposite ends toward the center to form a combustion chamber for the more perfect combustion of the gases distilled from the coking coal and by which combustion the crown or roof of the oven becomes intensely heated, thereby increasing the efficiency of the oven by reflecting the heat downward on the coking coal, and result in a superior quality of coke, and will, furthermore, permit the consumption of the gases without material waste of the carbon of the coal.

"With these and other objects in view, as will more fully hereinafter appear, the invention consists in certain novel features of construction and arrangement of parts, hereinafter fully described, illustrated in the accompanying drawings, and particularly pointed out in the appended claims, it being understood that various changes in the form, proportions, size and minor details of the structure may be made without departing from the spirit or sacrificing any of the advantages of the invention. * * *

"The shape of the crown is such that the entire charge may be dumped in; the inclination being sufficient to accommodate the angle of pile of the charge of coal to some extent, and after the insertion of the charge the central or highest point is trimmed in order to render the thickness of the layer of the charge approximately equal throughout. The construction of the sloping crown of the oven affords a combustion chamber for the burning of the gases which are distilled from the coking coal, thereby producing the requisite heat for rapid and perfect coking, and the heat is reflected downward on the coking coal, producing a superior quality of silvery coke. The air necessary to support combustion is admitted through both ends of the oven, so that the heat is practically uniform throughout, and the quantity of air admitted may be governed in the usual manner by closing the end openings to a greater or less extent. The charge opening is not closed during the entire coking process, and the gases distilled from the quantity of coal are consumed as rapidly as they are formed, thus maintaining the necessary heat without consuming any of the solid carbon of the coal. After the coking operation is complete, the brickwork at the ends of the oven is knocked down and streams of water are turned into the oven to extinguish the flame and cool down to the proper temperature for discharging the finished product. A suitable pusher is then introduced through one of the openings at one end of the oven and the body of coke as a whole is forced out, thereby producing very large blocks of coke.

"It is, of course, well known that coke in large blocks commands a much higher price than fine or small coke, and is practically essential in foundry work, and it is always the aim of the coke manufacturer to avoid crushing or breaking the coke into small particles. With an oven constructed in accord-

ance with the present invention, the entire body of coke may be discharged practically as one block, and afterwards broken into fragments of suitable size for handling.

"One of the most important features of the invention is the departure from the ordinary beehive type of oven now in common use, where there is difficulty in withdrawing the product and difficulty in controlling even and perfect combustion. The oven forming the subject of the present invention is so arranged that the charge of coal may be dumped in and leveled off within a very short time, while the necessary amount of air to support combustion is allowed to enter at both ends and the heat reflected from the sloped crown is sufficient to insure the quick generation of gases when the operation of coking begins. In the ordinary beehive type of oven, it requires from three to five hours work of one man to withdraw the charge, and a large portion of the coke is broken into comparatively small fragments, while in an oven constructed in accordance with the present invention the entire mass of coke may be forced out in practically a single block, and in less than a minute, thus not only saving time, but also saving considerable expense by preventing the loss of heat, the oven being retained at a very high temperature, so that the coking process may recommence immediately after the dumping of another charge into the oven.

"It will, of course, be understood that the shape of the roof of the oven may be altered in many ways without departing from the invention, and it may be sloped on straight lines, as indicated in Fig. 1, or on curved and straight lines, shown in Fig. 4, or the roof may be curved throughout, or otherwise so shaped that the vertical distance between the floor and the roof gradually increases from the doors inward."

The claims of the patent are as follows:

"1. A coke oven having a substantially level floor and parallel side walls higher in the middle than at the ends, said oven being open at both ends from wall to wall to provide an unobstructed, free passage from end to end, and a crown sloping upward from the ends toward a point about midway of the length of the oven and there provided with a charging opening.

"2. A coke oven having a substantially level floor, end retaining walls each with an opening of the same size as the opening in the other wall, a crown sloping continuously upward from the end retaining walls to an approximately central point and there provided with a charging opening, said crown being arched in a direction at right angles to the length of the oven, and parallel side walls extending through and from one opening to and through the other opening and approximately to the top of the crown adjacent to the charging opening therein.

"3. A coke oven having a central trunnel hole in its roof, the length of the oven chamber and the height of the roof being so proportioned that, when the top of a charge of coal deposited by gravity through the trunnel hole reaches said trunnel hole, the charge when leveled off will fill the oven substantially to the level of the draft openings.

"4. A coke oven having a substantially level floor and provided with parallel side walls, higher at the middle than at the ends, said oven being open at both ends from wall to wall to provide an unobstructed, free passage from end to end and a crown rising from the ends and provided about midway of its length with a trunnel hole."

The following is the substance of the testimony given by the plaintiff's expert on the important points:

The Mitchell oven is long and narrow; its sides are parallel, and both ends are open. It is a tunnel, the top being arched in the usual fashion, but the roof slopes upward from each end to the center, where a trunnel opens into the air, through which the coal is charged and the products of combustion escape. At each end the usual doors are found. These are sealed during the operation, except for holes ad-

mitting the necessary air, which circulates through the oven from each end toward the trunnel opening. The oven is banked and lined in the usual manner. It has only one opening, and through this the whole charge may be dumped down at one time, the peaked roof being intended to afford a combustion chamber above the coal that will be more spacious than if the roof were flat, and whose shape will also be better adapted to promote uniform coking throughout the whole of the tunnel. The shape of the interior is also intended to afford space enough under the trunnel to receive a conical pile of coal, which can be leveled down to a layer of proper depth for one operation of the oven. Leveling the pile to a horizontal layer is the first step, and this is most conveniently done by a machine inserted at one end, which pushes and pulls the pile of coal into the desired position along the hearth. The doors are then sealed with clay, but air openings are left, and the trunnel remains open.

As in other ovens, much heat remains in the walls from the operation just finished, and when the oven is closed, and the air draws in from the openings at each end, combustion begins almost at once. The gases are evolved all along the layer of coal, and the draft tends to carry them toward the center, combustion of course going on all the time. The volume of burning gas increases (as it does in the beehive oven also) as the center is approached. The slanting roof reflects the heat downward, thus helping to produce and maintain a nearly uniform degree of heat along the layer of coal. To quote the language of the expert:

"In other words, the Mitchell oven may be considered as a pair of vertically expanding tubes or tunnels placed end to end and meeting in the center an arrangement which provides for the balanced suction of the central outlet opening drawing from both ends of the tunnel and also gives a progressively increasing capacity from the ends toward the center to provide for the proper combustion of the progressively increasing volume of gas, which requires to be thoroughly associated with the air, in order that the combustion may be complete. It will also be observed that the introduction of the air supply from both ends of the oven subdivides, so to speak, the burning operation into two parts, each having an individual air supply and an individual supply of gas, which tends to promote a more perfect combustion.

"The progressive expansion of the tunnel takes place in a vertical direction, and not in a lateral direction, so that the gradual increase of the size of the oven from the ends toward the center is secured without any lateral expansion in its dimensions. Consequently, the sides of the tunnel remain substantially parallel. This permits, as I have heretofore explained, the leveling of the coal by means of a machine, instead of manually, and it likewise permits the use of a pusher applied to one end of the tunnel to force the coke out at the other end after the coking operation is completed."

He goes on to describe the rest of the operation, but there is nothing peculiar to Mitchell in the following paragraphs:

"Under the conditions just described the combustion of the gases in immediate contact with the upper surface of the line or layer of coal precedes until all of the gas has been expelled from the coal and burned up, such combustion giving a substantial uniform heating of the coal along the entire length of the oven, so that the coking operation is finished at substantially the same time at all points of the oven. In practice this coking operation occupies several days, according to the amount of coal provided in each charge. I believe it is the custom to charge the oven each Monday and Wednesday with coal

sufficient for 48 hours coking, and on Friday with a large amount sufficient for 72 hours coking.

"After all the gas has been expelled from the charge of coal the combustion should cease, leaving the resulting coke in an incandescent condition and of the structure characteristic of coke in distinction from coal, which has been brought about by the fusing of the coal. When the coking operation has thus been completed the doors are opened and streams of water introduced through the open doors to quench the incandescent coke. This is a somewhat important feature of the operation, it being desired to apply just enough water to quench the coke without soaking it, and after it has been quenched it is allowed to remain a sufficient time for the evaporation of any surplus water by the heat retained in the oven walls. It is also important that this quenching operation should not abstract an undue amount of heat stored in the walls of the oven, so that the ignition of the next succeeding charge of coal can take place without a long delay.

"The coke being now quenched and dried, a mechanical pusher is applied to one end of the line of coke and the entire mass thereby forced toward the opposite end and out of the door at that end, where it is caught by a conveyor that delivers it into railway cars for transportation. At some point in its travel from the oven to the car it passes over a screen and the pulverized portions thereof eliminated. It should be mentioned that the side walls of the oven are not exactly parallel, being some two or three inches further apart at the end toward which the coke is pushed, while there is also a slight inclination of the oven floor toward that end. This prevents the line of coke from binding as it is pushed out.

"The oven, as I have heretofore stated, is banked externally with clay, which serves to retain the heat therein, so that, in spite of the exposure of the interior of the oven during the quenching, drying, pushing, and refilling operations, and also in spite of the amount of water thrown into the oven to quench it, sufficient heat is retained in the oven walls, so that when it is refilled with a charge of coal, and the end doors closed, the combustion starts up in a short time and the described operation is repeated."

We have set forth with sufficient fullness, we think, what are claimed to be the peculiar merits of the Mitchell oven; but we are unable to see in it anything except an aggregation of well-known elements. The defendant's brief (page 65) seems to us to state the situation accurately:

"The question then presents itself: The longitudinal oven is old; it is old with a vault built on horizontal lines, and also with a vault built on rising lines, from the ends inward; it is old with wide doors for free discharge, and with narrower doors which necessitate removal of the coke piecemeal. It so happens that the wide-doored ovens shown in the prior patents and literature on the subject have horizontal vaults, and that the ovens with rising vaults have narrower end doors and require to be emptied slowly. There is, however, no structural difficulty in combining a rising vault and a wide end door. It had been done at one end of an oven; it had been done at both ends. What, then, is to hinder any builder of a longitudinal oven from putting in one and the same structure wide doors (at both ends) and the rising vault of Rive de Gier, or that of Wedding? Is this a patentable invention to Mitchell, or mere aggregation? The question must be answered according to the results attained. * * *

"The result must be, first, a better result than the horizontal roofed oven afforded; and, second, a different result from that afforded by the rising vault as it had previously existed in Rive de Gier and in Wedding. Unless these things be true; or, rather, if these things be proved to be untrue, then Mitchell has attained no new result and his oven is merely an aggregation of structural features taken from pre-existing ovens, and is not a patentable achievement.

" 'Merely bringing old devices into juxtaposition, and there allowing each to

work out its own effect without the production of something novel, is not invention.' Hailes v. Van Wormer, 20 Wall. 353, 368."

Essentially the dome of the beehive, somewhat changed in shape, has been placed on the vertical, parallel walls of the old longitudinal oven, and in our opinion the changed shape of the dome has not changed its function or added to its efficiency in a sensible degree. It is also pertinent to observe that the patent gives no instruction as to the angle of the peaked roof, apparently leaving that to be discovered by experiment. Certainly, if the angle of the Mitchell roof were only 2 per cent. it would at once encounter the Thomas circular, and it is very difficult indeed to decide from the Mitchell patent at what angle above 2 per cent. the Thomas oven would cease to anticipate. Where is the dividing line to be drawn between Thomas and Mitchell?

But is it a fact that the Mitchell oven shows marked superiority over others? Without reproducing the details of tests and experiments made with other ovens—notably with the Thomas oven—we may say that the whole record has been examined with care, and that we are unable to reach the conclusion that coke made in the Mitchell oven is so much better than coke made in an oven with a horizontal vaulted roof as to point distinctly to the peaked roof as the source of superiority. And we do not understand it to be denied that beehive coke is in every respect as good as the coke from the Mitchell oven. It is mechanical aids to the process that have been needed, and as these can only be used conveniently with the long narrow oven, this fact may in the end dethrone the beehive; but, so far as the actual burning of the coal is concerned, nothing has yet been discovered or invented that is superior. In the effective language of one of the witnesses:

"The open-end oven of whatever type is not a method of making better coke, but is a better method of making coke. Its value and utility lie in the fact that it can be mechanically operated, thereby eliminating the inefficient and incompetent laborer."

But the open-end oven is free to the world, while, of course, its mechanical additions may be susceptible of many patentable improvements.

There are many minor matters that cannot be discussed without unduly prolonging this opinion. We shall therefore only add that we agree with the District Court that the Mitchell oven does not disclose invention, and accordingly direct the affirmance of the decree.

BUFFINGTON, Circuit Judge, took no part in the consideration and decision of this case.